IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COILCRAFT, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | No. 02 C 5653 |
| ) | Paul E. Plunkett, Senior Judge |
| v. ) | |
| ) | |
| M/A COM, INC. and TECH-CERAM ) | |
| CORPORATION ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION AND ORDER

Coilcraft, Incorporated ("Coilcraft" or "Plaintiff"), an inductor coil manufacturer, has sued one of its suppliers, M/A Com, Inc., and its subsidiary, Tech-Ceram Corporation, (collectively, "Defendants") for breach of contract. Coilcraft seeks damages for allegedly faulty goods it purchased from Defendants. The case is now before the Court on Defendants' Federal Rule of Civil Procedure 56(c) motion for summary judgment. Defendants claim that Coilcraft is not entitled to damages because it accepted the goods, handled them as if it owned them, and sold some of them to customers. Because we find that a genuine issue of material fact exists as to whether Coilcraft revoked its acceptance of the goods and acted reasonably when it used the goods, we deny Defendants' motion.

### Facts

The following facts are undisputed unless otherwise noted. Coilcraft manufactures inductor coils. The coils are made using metallized bases, commonly referred to as "football parts" (hereinafter "football parts" or "parts"), that were produced by Tech-Ceram. In July 2000, Coilcraft

began receiving an unusually high number of complaints from customers concerning the solderability of their coils. Coilcraft traced the problem back to Tech-Ceram's football parts.[1] Coilcraft sent a series of Discrepant Material Reports ("DMR") to Tech-Ceram notifying them of the individual lot numbers of parts they were rejecting. Tech-Ceram agreed to the return of more than five million parts in December 2000 or January 2001. The complaints continued, so Coilcraft contacted Tech-Ceram once again. Tech-Ceram responded by sending representatives to Coilcraft to assure Coilcraft that Tech-Ceram would improve its manufacturing processes to avoid further problems with the parts.

The particular parts at issue in this lawsuit were delivered to Coilcraft based on three separate purchase orders: (1) On May 17, 2000, Coilcraft ordered 35 million football parts. Coilcraft paid Tech-Ceram $2,041,843 for the parts, which were delivered between May 2000 and March 2001. (2) On July 20, 2000, Coilcraft ordered an additional 35 million football parts. Coilcraft paid Tech-Ceram $1,805,221[2] for the parts, which were delivered between September and November 2000. (3) On November 7, 2000, Coilcraft ordered 30 million parts. Coilcraft paid Tech-Ceram $1,605,017 for the parts, which were delivered by August 2001.

During the first half of 2001, Coilcraft experienced a reduction in demand for its inductor coils because of a slow down in the electronics industry. Nonetheless, Coilcraft continued to order football parts from Tech-Ceram and to work with them to solve the solderability problems, but the problems persisted. On October 31, 2001, Coilcraft sent DMR 61912B to M/A Com, Tech-Ceram's

---

[1] Defendants deny that the parts were defective and assert that other factors may have caused the solderability problems.

[2] According to Plaintiff's complaint, Tech-Ceram shipped more parts than were ordered with different amounts each time, which accounts for the varying purchase prices.

new parent company, which listed the rejected lot numbers for parts received through the three separate orders, all sent between September 2000 and August 2001. All told, Coilcraft rejected 36,093,662 parts. Around the same time, demand for the inductor coils rebounded. This increased demand, coupled with the defects it says were caused by Defendants' football parts, meant that Coilcraft nearly had to halt production. Coilcraft contacted Defendants and notified them of the supply situation. Coilcraft suggested three possible solutions: Defendants could sort the parts, return the good parts to Coilcraft and credit or replace the bad parts; Coilcraft could sort the parts and return the bad parts to Defendants for replacement or credit; or Coilcraft could return all the rejected parts for credit or replacement. Defendants never responded to these suggestions. Coilcraft claims that it sought an agreement from Defendants to accept the return of the parts on numerous occasions, but Defendants refused to cooperate. Coilcraft has a policy of not returning products without the authorization of the seller.

Thus, faced with what it claims could have been a crippling shortage of football parts, Coilcraft shipped all 36,093,662 football parts to China for visual inspection and sorting in late 2001. Nearly 34 million of the parts were sorted and more than 28 million of the parts passed inspection. Coilcraft then began using the parts that passed to make inductor coils which it sold to customers who continued to complain of failure rates of up to 10%. The approximately 17 million football parts that had not yet been used or sold were shipped to Coilcraft's El Paso warehouse where 16,315,475 of them remain. Coilcraft sent five million of the parts to a facility in New Jersey where they were analyzed to determine whether they could be re-plated and resold.[3] The company

---

[3] Defendants admit the parts were tested but deny that Coilcraft can determine which of the parts are from the lots rejected in DMR 61219B.

performed visual inspection, solderability tests, and nickel-plating thickness measurements, revealing specific defects in the parts, including holes in the plating and missing metallizing. Even after 2.7 million of the parts were reworked, the parts failed at an unacceptable rate.

Coilcraft filed a breach-of-contract lawsuit seeking $832,089.22 plus interest from Defendants for the defective parts; $23,330.11 plus interest for stripping the metal off 2.7 million allegedly defective parts and replacing the metal; $54,218.00 plus interest to reimburse Coilcraft for the refunds it provided to its customers; and $236,917.94 plus interest for the sorting the parts in China. Defendants then filed a counterclaim for parts ordered by and received by Coilcraft between August 2001 and November 2001 because Coilcraft has refused payment on the parts.

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Discussion

Defendants argue that Coilcraft is not entitled to any damages from the allegedly defective

football parts because Coilcraft did not properly reject the parts. Coilcraft responds that it did reject the parts, or, alternatively, that it accepted the parts but then revoked its acceptance after discovering the defects were not curable. Our analysis is guided by the Uniform Commercial Code, which defines acceptance as occurring when the buyer:

>   (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>   (b) fails to make an effective rejection (subsection (1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>   (c) does any act inconsistent with the sellers ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

810 Ill. Comp. Stat. 5/2-606.

We find that Coilcraft accepted the football parts. First, Coilcraft paid for all of the parts at issue. "[P]ayment after tender is always one circumstance tending to signify acceptance of the goods but in itself it can never be more than one circumstance and is not conclusive." § 5/2-606, cmt. n.3. Second, Coilcraft sold parts from the purchase orders to customers. Third, Coilcraft allowed the reasonable time for inspection to pass long before it attempted to reject the football parts at issue. According to Coilcraft, the company visually inspects parts from suppliers within twenty-four hours of receipt.[4] (Pl.'s Resp. Defs.' L.R. 56.1 Stmt. 96.) Taken together, therefore, we find that these acts constitute acceptance of the parts.

All is not lost for Coilcraft, however. The UCC allows a buyer to revoke its acceptance. Revocation may occur under the following conditions:

---

[4]Though Coilcraft suggests that the defects in the football parts at issue could not be discovered until customers began to complain, it had a reasonable opportunity to inspect the parts for purposes of acceptance. (*See id.* at 107.)

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>> (a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or
>> (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

§ 5/2-608.

Defendants contend that Coilcraft did not properly revoke its acceptance when it issued DMR 61912B. First, Defendants argue that Coilcraft was not substantially impaired by the allegedly defective parts. They reason that because the majority of the parts that were sorted in China and eventually sold to customers experienced only a 1–2% failure rate, Coilcraft was not substantially impaired.[5] "Whether the value of the product has been impaired is determined subjectively, from the buyer's perspective." *N. Am. Lighting, Inc. v. Hopkins Mfg Corp.*, 37 F3d. 1253, 1258 (7th Cir. 1994) (citing *GNP Commodities, Inc. v. Walsh Heffernan Co.*, 95 Ill.App.3d 966, 51 Ill.Dec. 245, 250, 255, 420 N.E.2d 659, 664, 669 (1981)). "Whether such impairment is 'substantial,' however, is determined based on the objective evidence." *Id.* The issue is a question of fact. *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App.3d 313, 321, 722 N.E.2d 227, 743 (1999).

Coilcraft contends it was substantially impaired by the defects, providing evidence that the parts failed at an unacceptable rate. The evidence takes the form of both customer complaints and

---

[5] Coilcraft says that it sold these parts to customers "whose particular soldering process" resulted in the lower failure rate.

6

returns as well as analysis demonstrating flaws in the football parts that could potentially affect solderability. Both Plaintiffs and Defendants agree that solderability is very important for ensuring proper functioning of the coil and integrity of the circuit boards that Coilcraft's customers manufacture. Defendants deny that the solderability problems of Coilcraft's inductor coils were caused by defects in the football parts. Thus, a genuine issue exists as to whether Coilcraft was substantially impaired by the defects.

Second, Defendants claim that Coilcraft did not revoke under § 5/2-608(1)(a) because Defendants never assured Coilcraft that any perceived non-conformities of the parts listed in DMR 61912B would be cured. We note that § 5/2-608(a) does not call for assurances from the seller, merely that the buyer reasonably believes that any non-conformities will be cured. At any rate, "[a] seller may be found to have given "assurances" within the meaning of § 5/2-608 based on either circumstantial evidence or the seller's explicit language." *N. Am. Lighting*, 37 F.3d at 1257. Coilcraft does not argue that Defendants explicitly assured them that the defects of the specific parts at issue here would be cured, but that previous dealings with the company led it to believe they would be. There is some circumstantial evidence to support this belief. Defendants agreed to accept the return of five million parts from the May 2000 purchase order when Coilcraft's customers first began to complain of solderability problems. When the problems persisted, Defendants visited Coilcraft facilities to ascertain the problems and work through them. Thus, Coilcraft assumed the problems would be cured. Whether this assumption was reasonable is a question for the jury.

Third, Defendants argue that Coilcraft knew of the problems with the football parts in March 2001 and cannot therefore claim that the non-conformity was difficult to detect under § 5/2-608(b). Coilcraft has some evidence, however, that it did not know of the solderability problems until

customers began to complain. Even then, the company did not know the exact nature of the defects until after the parts were shipped back from China, when it sent five million parts to an electroplating company in New Jersey to analyze the parts and to find out if any of the parts could be reworked and used. Once again, a genuine issue suitable for a jury has been raised.

Under § 5/2-608(3), Coilcraft had the same duty toward the football parts after revocation as if it had rejected them, leaving the issue of whether Coilcraft invalidated its revocation by shipping the rejected parts to China and selling some of the parts to customers. Though the rules of rejection mandate that acceptance of part of a commercial unit constitutes acceptance of the whole and that using rejected goods in a manner inconsistent with the rights of the seller, these rules are not absolute. Once again, reasonableness reigns. Factors relating to reasonableness include "'the degree of economic and other hardship that the buyer would suffer if he discontinued using the defective good; the reasonableness of the buyer's use after revocation as a method of mitigating damages; the degree of prejudice to the seller; and whether the seller acted in bad faith.'" *Alden Press, Inc. v. Block & Co., Inc.*, 173 Ill. App. 3d 251, 262–63, 527 N.E.2d 489, 496 (1988) (quoting *Johannsen v. Minnesota Valley Ford Tractor Co.*, 304 N.W.2d 654, 658 (Minn. 1981)). The reasonableness of Coilcraft's use of the parts under these circumstances is a matter for the jury. *See Alden Press*, 173 Ill. App. 3d 251, 264, The plaintiff has the burden of proving that the use was reasonable. *Basselen v. Gen. Motors Corp.*, 341 Ill. App. 3d 278, 283, 792 N.E.2d 498, 503 (2003).

Here, Coilcraft claims it faced a "line down" situation where production would stop if it did not use at least some of the football parts sent by Defendants; that it mitigated damages in excess of $1,000,000 by sorting the parts itself and using parts found to be conforming; and that Defendants did not suffer any prejudice as the result of Coilcraft's actions. Coilcraft proffers limited evidence

to show that the company faced real economic hardship unless it used some of the rejected parts. There is deposition testimony underscoring the company's desire to fulfill customer orders, as well as copies of emails sent to Defendants urging them to help Coilcraft resolve the situation to help preserve Coilcraft's reputation with its customers. One of the emails even notifies Defendants that "[d]ue to the quality of this material, we will be in a line down situation in a couple of weeks." (Pl.'s Resp. Defs.' Mot. Summ. J. Ex. 1 at Ex. 2.) Yet Coilcraft points to no evidence that Defendants were the only suppliers of the football parts. On balance, however, we find that Coilcraft has presented more than a "mere scintilla" of evidence to persuade a jury that its actions were reasonable under the circumstances. The fact that Coilcraft used some of the parts that made up some of the lots listed on DMR does not, therefore, preclude them from surviving summary judgment.

Defendants also try to argue that Coilcraft's rejection of the football parts was ineffective because Coilcraft rejected individual lots, rather than an entire purchase order. Defendants rely on § 5/2-612 (3), which reads, "Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation . . . ." Yet Coilcraft does not and has never sought cancellation of any of the contracts and thus § 5/2-612(3) is not applicable.

Section 5/2-612(2) allows a buyer to reject "any installment which is non-conforming if the non-conformity substantially impairs the value of that installment and cannot be cured." Defendants contend that Coilcraft was not substantially impaired because of the 85% of the parts sent under the three purchase orders involved were eventually used. Again, Coilcraft does not seek damages for breach of the entire contract, so this figure is not relevant. Furthermore, Coilcraft has shown

evidence that it was substantially impaired. Coilcraft's specification sheets for football parts, issued to all outside vendors, specifies the number of allowable defects. As part of Coilcraft's inspection procedures, sample parts are tested; the sampling sizes are such that finding a defect in one part is sufficient to reject the lot. Coilcraft is alleging defects well beyond the allowable limits under the specifications. Moreover, Defendants allowed Coilcraft to return individual lots on at least one prior occasion, when it accepted the return of the five million parts in late 2000 or early 2001. Coilcraft therefore had reason to expect that rejecting by individual lots was appropriate. We therefore do not find that this argument precludes Coilcraft from claiming damages.

Finally, Defendants argue that Coilcraft is barred from any remedy in this matter because its notice of rejection or revocation to Defendants was for 36 million parts, not the 16 million parts now at issue. The UCC requires notification of breach to the seller within a reasonable amount of time in order to preserve the right of recovery. *See* § 5/2-607(3)(a). Coilcraft's initial notification of breach is sufficient to preserve this right. The parts at issue were allegedly named in DMR 61219B. Furthermore, Coilcraft has presented evidence that it remained in contact with Defendants regarding the progress of its sorting procedures in China. Thus, Defendants had ample notice that the number of rejected parts was dwindling. Therefore, Defendants are not entitled to summary judgment on this basis.

## Conclusion

Based on the foregoing, Defendants' motion for summary judgment is denied.

**ENTER:**

[signature]

**SENIOR UNITED STATES DISTRICT JUDGE**

**DATED:** MAY 26 2005